UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X
                            :

KARL VANDERWOUDE,              :

                            :

                   Plaintiff,     :          12 Civ. 9046 (KPF)

                            :

               v.                    :       <u>OPINION AND ORDER</u>

                            :

THE CITY OF NEW YORK, *et al.*,    :

                            :

                 Defendants.  :

                            :

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  June 10, 2014

KATHERINE POLK FAILLA, District Judge:

       On March 12, 2012, law enforcement officers received an anonymous tip identifying Plaintiff Karl Vanderwoude as a suspect in a plague of sexual groping incidents that beset Manhattan in February and March of 2012. As a result, Plaintiff was detained by law enforcement, and subsequently arrested and arraigned on one or more misdemeanor charges. Shortly after Plaintiff's arraignment, the charges against Plaintiff were dismissed based on exculpatory evidence. Plaintiff then filed the instant lawsuit against the City of New York, Detective Michael Rama, and Police Officer Jane Doe Number 1, alleging deprivation of his civil rights under 42 U.S.C. § 1983, as well as false arrest, malicious prosecution, negligence, assault, battery, and defamation under New York State law.

       Defendants now move for summary judgment on all of Plaintiff's claims. Because Plaintiff has raised an issue of material fact as to when he was arrested, Defendants' motion for summary judgment on this claim is denied.

Defendants' motion for summary judgment on the remaining claims, however, is granted for the reasons discussed in the Opinion.

## BACKGROUND[1]

### A.  The Groping Incidents

#### 1.  Victims 1 and 2

In February and March 2012, a number of women reported incidents of forcible sexual touching and lewd behavior in Manhattan.  On February 25, 2012, a woman ("Victim No. 1") reported that while she was in the vicinity of Park Avenue and 62nd Street earlier that day, a white male approached her from behind and grabbed her inner thigh with his hand.  (Def. 56.1 ¶ 1).  On February 27, 2012, a woman ("Victim No. 2") reported that on the same day as the incident involving Victim No. 1, in the vicinity of 67th Street and Second

---

[1]     The facts set forth herein are drawn from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1"); the Declaration of Okwede N. Okoh in Support of Defendants' Motion for Summary Judgment ("Okoh Decl.") and the exhibits attached thereto; Plaintiff's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1"); and the Declaration of John Tumelty in Opposition to Defendants' Motion for Summary Judgment ("Tumelty Decl.") and the exhibits attached thereto.

For convenience, the parties' memoranda of law will be referred to as follows: Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment as "Def. Br."; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment as "Pl. Opp."; and Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment as "Def. Reply."

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Avenue, a white male in his thirties, who was approximately 5 feet 11 inches tall with brown hair, grabbed her buttocks and then ran away.  (*Id.* at ¶ 5). Victim No. 2 also reported that the man was wearing gray slacks, black shoes, and a black waistcoat.  (*Id.*).

On February 27, 2012, Detective Michael Rama of the New York City Police Department (the "NYPD") and another officer conducted a "camera canvas" of the area, in the course of which they requested surveillance video from the Fox News building at 207 West 67th Street, as well as from buildings located at 227 East 67th Street and 254 East 68th Street.  (Def. 56.1 ¶ 6).  On the following day, Fox News notified Det. Rama that its video was available. (*Id.* at ¶ 7).  The video showed Victim No. 2 walking eastbound on 67th Street from Third Avenue with a male walking in very close proximity; the video later showed the male running westbound on the north side of 67th Street.  (*Id.*).

Det. Rama also met with the superintendent of the building located at 254 East 68th Street to review the video surveillance for that building.  (Def. 56.1 ¶ 8).  That video showed the same white male pictured in the Fox News surveillance walking behind Victim No. 2, and then a short time later running westbound on 67th Street while being chased by Victim No. 2.  (*Id.*).[2]

Approximately one month later, on March 27, 2012, Det. Rama interviewed a male witness to the incident involving Victim No. 2.  (Def. 56.1

---

[2]     On February 29, 2012, Det. Rama and another detective spoke with an individual from the Office of the Deputy Commissioner for Public Information (the "DCPI") about releasing this surveillance footage to the media.  (Okoh Decl., Ex. D).  Det. Rama testified that any information was released to the media through the DCPI, and that he was not responsible for the release.  (Tumelty Decl., Ex. B at 74-75).

¶ 11).  This witness explained that he had been standing outside of the Fox News building when a girl yelled to him to stop a man who was running down the street.  (*Id.*).  The witness chased the man, who ran into a Staples store on 66th Street and Second Avenue.  (*Id.* at ¶ 12).  The witness notified police officers on the corner about the male suspect, and those officers entered Staples, but did not find the suspect.  (*Id.*).

On March 30, 2012, pursuant to a subpoena, Staples produced the February 27 surveillance footage to Defendants.  (Okoh Decl., Ex. D). Det. Rama met with a Lieutenant at the DCPI on April 9, 2012, regarding the release of the video obtained from the Staples store to the media.  (*Id.*).  The DCPI later released copies of photographs and a video to the media, again without Det. Rama's involvement.  (*Id.*).

### 2.    Victims 3, 4, and 5

On March 1, 2012, Det. Rama went to Lenox Hill Hospital to speak with a woman ("Victim No. 3") who had been attacked on February 26, 2012, at approximately 11:00 a.m.  (Def. 56.1 ¶ 19).  Victim No. 3 reported to Det. Rama that when she exited the subway train at Houston Street, she was assaulted by an unidentified man.  (*Id.* at ¶ 20).  Specifically, Victim No. 3 explained that as she was gathering her belongings, the man grabbed her buttocks and crotch area.  (*Id.* at ¶ 21).  When she turned around, Victim No. 3 saw that her assailant had traveled on the same subway train as she.  (*Id.*).  The victim believed that she was likely assaulted around 200 Varick Street, and that after

the incident, the man fled eastbound on the north side of King Street.  (*Id.* at ¶ 23).

Victim No. 3 described the man as white, in his thirties, approximately 6 feet tall with brown hair, and dressed in brown shoes, dark pants, and a coat. (Def. 56.1 ¶ 21).  Victim No. 3 did not report the incident until she watched a news story about a similar incident occurring to another victim.  (*Id.* at ¶ 22). Victim No. 3 also stated that the man referred to in the news story looked similar to the man who had assaulted her.  (*Id.*).  No surveillance videos were located near the incident that identified the suspect.  (*Id.* at ¶¶ 23-24).

On March 26, 2012, law enforcement received notice that still another woman ("Victim No. 4") had been the victim of a forcible touching incident, this time on March 22, 2012, at the Broad Street and Exchange Place subway station.  (Def. 56.1 ¶ 25).  Victim No. 4 was interviewed by law enforcement on April 16, 2012, via telephone regarding the incident.  (*Id.* at ¶ 26).  She explained that on the day of the incident, at around 9:00 a.m., she was walking down the stairs at the Broad Street and Exchange Place subway station when an unidentified man approached her from behind and grabbed her buttocks. (*Id.*).  Victim No. 4 described the man as a white male in his late twenties, 5 feet 10 inches with medium build, who was wearing a black button-down shirt and gray pants.  (*Id.* at ¶ 27).  On April 25, 2012, Det. Rama met with the building manager at 15 Broad Street to obtain a copy of the relevant video surveillance from March 22, 2012.  (*Id.* at ¶ 28).

On April 3, 2012, law enforcement conducted a telephone interview with another woman ("Victim No. 5"), who filed a forcible touching complaint on March 30, 2012. (Def. 56.1 ¶ 29). Victim No. 5 explained to law enforcement personnel that when she was on a downtown 4 subway train she noticed a man standing very close to her, despite the train not being crowded. (*Id.* at ¶ 30). When Victim No. 4 exited the train at the Brooklyn Bridge stop, she realized that the same man was walking behind her, so she slowed down in an effort to let him pass in front of her. (*Id.* at ¶ 31). Later, when Victim No. 5 was on the stairs after exiting the station, she felt something between her legs. (*Id.*). When she looked down, she saw the man who had been on the subway with her, placing his cellular telephone under her dress. (*Id.*). At that point, the man ran back towards the subway station. (*Id.*). Victim No. 5 described the perpetrator as a white male in his mid-twenties, who was six feet tall, approximately 170 pounds, and who was wearing black pants, shoes, and a black coat. (*Id.* at ¶ 32).

Det. Rama requested video surveillance from the Brooklyn Bridge subway station. (Def. 56.1 ¶ 35). On April 4, 2012, Victim No. 5 reviewed a photo array prepared by the NYPD, but was unable to identify the perpetrator. (*Id.* at ¶ 33). Det. Rama and another detective conducted a second interview of Victim No. 5 on April 26, 2012, outside of the victim's workplace. (*Id.* at ¶ 36). During that interview, Victim No. 5 told the detectives that she believed the man who had been identified in the news media as the groper (i.e., Plaintiff) was the same man who attacked her. (*Id.*).

6

**B.      The NYPD's Investigation into the Reported Incidents**

On April 4, 2012, wanted posters and a flyer were distributed to law enforcement personnel with instructions that the posters were not to be distributed to any news media.  (Def. 56.1 ¶ 34).  The posters identified a suspect involved in the March 30, 2012 subway groping, described him as a "male white 20-25 years old, 6'0, 170 lbs," and included a still photograph of the alleged perpetrator taken from the surveillance footage.  (*Id.*).  On April 11, 2012, a second flyer was provided to administrators of the NYPD's Crime Stoppers Program for public distribution.  (*Id.* at ¶ 40).

**1.      The Crime Stoppers Anonymous Tips**

On April 10, 2012, Det. Rama filed a request for a Crime Stoppers Reward that outlined a male perpetrator who had, on four separate occasions, assaulted female victims by grabbing their buttocks and crotch areas.  (Def. 56.1 ¶ 37).[3]  The request also included a description of the assailant as a white male, age 25 to 35, 5'11 to 6'1 with brown hair, and weighing approximately 190 pounds.  (*Id.*).  The description further provided that the man was typically well-dressed, in pants and a coat.  (*Id.*).  Law enforcement received a number of responses to this request.

On April 10, 2012, Det. Rama and another detective received the first anonymous tip, which asserted that a male fitting the perpetrator's description was a manager at a clothing store.  (Def. 56.1 ¶ 38).  When the detectives went

---

[3]      On April 9, 2012, Det. Rama informed another detective that the incident involving Victim No. 5 would be included as part of the Manhattan Special Victim Unit's crime pattern 1/2012, which included the other four groping cases.  (Def. 56.1 ¶ 35).

to the clothing store, security personnel showed them pictures of the two male managers, neither of whom fit the perpetrator's description.  (*Id.*).

On that same day, the detectives received a second anonymous tip advising that the suspect worked at a Social Security Office, and providing the address for that office.  (Def. 56.1 ¶ 39).  The detectives went to the office, and showed the picture of the suspect to the security manager, who denied that the person depicted in the picture worked at that office.  (*Id.*).

On April 10, 2012, a third anonymous tip was received, the information from which was provided to Det. Rama the following day.  This tip related that a man named Karl Vanderwoude was the alleged perpetrator, and that he volunteered at a place that helped women who were victims of domestic violence.  (Pl. 56.1 ¶ 77).  A background check revealed Plaintiff's address and date of birth, and showed that Plaintiff had no criminal record.  (*See id.*).  Det. Rama testified that prior to receiving this anonymous tip, there was no other information connecting Plaintiff to the groping incidents.  (Tumelty Decl., Ex. B at 31).

### 2.    The Investigation into Plaintiff

On April 11, 2012, at approximately 2:50 p.m., Det. Rama and another detective went to Plaintiff's apartment to speak with Plaintiff, who was not home.  (Pl. 56.1 ¶ 78).  The detectives spoke with Plaintiff's landlord and showed her a still photograph of the suspect from the surveillance footage.  (*Id.*).  The landlord informed the detectives that the photograph did resemble

one of the men living in the basement apartment, but that she could not be
sure.  (*Id.*; Tumelty Decl., Ex. A).

The detectives returned the next day on April 12, 2012, at approximately
8:45 a.m.  (Def. 56.1 ¶ 43).  Again, Plaintiff was not home.  (*Id.*).  During this
visit, the detectives spoke a second time with Plaintiff's landlord, who advised
the detectives that she spoke with and closely observed one of her tenants
since their last visit, and that this tenant was not the person identified in the
picture.  (Pl. 56.1 ¶ 79).  She also informed the detectives that she told the
tenant that the police were looking for him, and that the tenant had given the
landlord his cellular telephone number to give to the police.  (Tumelty Decl.,
Ex. A).

At approximately 2:55 p.m., the detectives called the number given to
them by the landlord.  (Pl. 56.1 ¶ 80).  When a man answered the telephone,
the detective stated "Karl."  (Tumelty Decl., Ex. A).  The man responded no, and
advised that his name was Lance Villio and that he had given his telephone
number to the landlord because she had told him the police were looking for
him.  (*Id.*).  The detective explained that the police wanted to show him a
photograph to see if he could identify the pictured person.  (*Id.*).  Villio
explained that he was in New Jersey, and that he would not be back to his
office in Manhattan until around 5:00 p.m.  (*Id.*).  The detective then asked
Villio if he had a roommate, to which Villio responded in the affirmative; Villio
informed the detective that his roommate's name was Karl, and that he (Karl)
would be home at that time because he had left work sick that day.  (*Id.*).

9

Later that day, at approximately 4:45 p.m., Det. Rama and another detective returned to Plaintiff's home.  (Def. 56.1 ¶ 47).  When the detectives arrived at Plaintiff's basement apartment, Plaintiff answered the door.  (*Id.*).  The detectives remained in the entryway to Plaintiff's apartment while they asked him questions and showed him a still photograph on a cellular telephone of the perpetrator.  (*Id.* at ¶ 49).  Plaintiff acknowledged that the pictured man had similar features to Plaintiff, and that although he did not recognize the man, the man did look like Plaintiff.  (*Id.* at ¶ 51).  After showing Plaintiff the picture, the detectives asked Plaintiff if he would accompany them to the precinct.  (*Id.* at ¶ 52).  Plaintiff agreed.  (*Id.*).  Plaintiff was then transported to the police station in the detective's car, during which time he was not placed in handcuffs.  (*Id.* at ¶ 53; Okoh Decl., Ex. B at 18).

When Plaintiff arrived at the precinct, Det. Rama placed Plaintiff in a room with a table, chairs, and one-way glass, and closed the door.  (Def. 56.1 ¶ 54; Okoh Decl., Ex. B at 19).  Det. Rama took Plaintiff's cellular telephone, keys, and wallet.  (Okoh Decl., Ex. B at 19; *see also* Tumelty Decl., Ex. B at 49).  Det. Rama testified that at this point in time, Plaintiff was not free to leave because law enforcement was "conducting an investigation," and trying to determine if Plaintiff committed the reported offenses.  (Tumelty Decl., Ex. B at 48).  The record does not indicate whether Det. Rama made this clear to Plaintiff, although, as discussed below, Det. Rama did inform Plaintiff that law enforcement thought Plaintiff was the person depicted in the surveillance.

Plaintiff remained in this room alone for approximately 30 to 45 minutes before Det. Rama returned.  (Def. 56.1 at ¶¶ 55-56).

When Det. Rama returned, at approximately 6:15 p.m., he showed Plaintiff a second still picture of the alleged groper, a Caucasian male with short hair wearing a dark coat.  (Def. 56.1 ¶ 56).  Plaintiff again acknowledged that the man in the picture had similar features to, and looked like, Plaintiff. (*Id.* at ¶ 57).  Plaintiff asked Det. Rama why the police believed that Plaintiff would know the person in the picture.  (*Id.* at ¶ 58).  Det. Rama informed Plaintiff that the person in the photograph was involved in a crime, and that the police believed that Plaintiff was the person in the picture.  (*Id.*).  Det. Rama then left Plaintiff alone in the room again for approximately one hour, according to Plaintiff.  (*Id.* at ¶ 59; Okoh Decl., Ex. B at 24).

When Det. Rama returned, he showed Plaintiff video surveillance footage from Staples showing a tall, Caucasian male with short hair, wearing a dark-colored coat and dark pants.  (Def. 56.1 ¶ 60; Okoh Decl., Ex. B at 25; Tumelty Decl., Ex. B at 51).  Plaintiff acknowledged that the man in the video looked like the man shown to Plaintiff in the still photographs, and also looked similar to Plaintiff.  (Def. 56.1 ¶ 61).  After showing Plaintiff the video, Det. Rama informed Plaintiff that he believed the man in the video was Plaintiff.  (*Id.* at ¶ 62).  Plaintiff denied being that person.  (*Id.*).  Plaintiff informed Det. Rama that he only rides the F subway line from his house to work, and proffered his Metrocard so that Det. Rama could confirm that he only rode the F train.

(Tumelty Decl., Ex. A).[4]  Plaintiff also provided his place of employment in Manhattan, and advised that he has been employed there since 2011, and works Monday through Friday from 8:00 a.m. to anywhere between 6:30 p.m. and 8:00 p.m.  (*Id.*).  Det. Rama did not attempt to contact Plaintiff's employer or request that other police officers do so.  (Pl. 56.1 ¶ 101).

Det. Rama then informed Plaintiff that they were going to conduct a lineup involving Plaintiff, and that if Plaintiff was not chosen in the lineup, he would be released.  (Def. 56.1 ¶ 64).  Det. Rama testified that the lineup was conducted because he and at least one other detective were not positive that Plaintiff was the man pictured in the photographs.  (Tumelty Decl., Ex. B at 68).  The lineup took place at approximately 9:20 p.m. in the room where Plaintiff had been for the duration of his time at the police station.  (Def. 56.1 ¶ 65).  The other participants in the lineup, who were police officers from different commands, were brought into the room, and placed in number order with Plaintiff choosing to be number two.  (*Id.*).  Victim No. 5 was in another room with an NYPD Sergeant and an Assistant District Attorney; she could see the men included in the lineup through one-sided glass.  (*Id.* at ¶ 66).  When Victim No. 5 was asked if she recognized anyone seated in a chair in the other room, she identified male number two, Plaintiff, as the man who had assaulted her.  (*Id.*).

---

[4]     A check of the Metrocard revealed no evidence that it had been used at any of the subway stations where the incidents occurred.  (*See* Pl. 56.1 ¶ 102).

After the lineup, Det. Rama informed Plaintiff that he had been chosen out of the lineup.  (Def. 56.1 ¶ 67).  Plaintiff testified that Det. Rama once again showed him the Staples video surveillance and stated that Plaintiff was the person in the video.  (Okoh Decl., Ex. B at 30).  Plaintiff again denied being the man in the video.  (*Id.*).  Plaintiff was then formally arrested; an arrest report dated April 13, 2012, at 10:25 p.m., charged Plaintiff with the misdemeanor offense of forcible touching, a violation of New York Penal Law § 130.52.  (Def. 56.1 ¶ 63; Okoh Decl., Ex. J).[5]  Plaintiff was also photographed and fingerprinted before being placed in a holding cell overnight.  (Def. 56.1 ¶ 68).

The next day, April 13, 2012, Plaintiff participated in a second and then a third lineup, each conducted in the same manner as the first.  (Def. 56.1 ¶ 70).  During the second lineup, which occurred at approximately 10:20 a.m., Plaintiff was selected by Victim No. 2.  (*Id.* at ¶ 71).  The third lineup was conducted with Victim No. 1 within minutes of the second lineup.  (*Id.* at ¶ 72).  Victim No. 1 advised that she did not recognize anyone in the lineup.  (*Id.*).

On April 13, 2012, at approximately 6:20 p.m., a search warrant was executed at Plaintiff's apartment.  (Pl. 56.1 ¶ 86).  Some of Plaintiff's clothing and personal items were seized.  (*Id.*).  No evidence was discovered that

---

[5]     Plaintiff alleges in his Complaint that he was charged with forcible touching, in violation of New York Penal Law § 130.52; sexual abuse in the third degree, in violation of New York Penal Law § 130.55; and unlawful surveillance in the second degree, in violation of New York Penal Law § 250.45(4).  The arrest report shows that Plaintiff was only charged with forcible touching (Okoh Decl., Ex. J), and because the parties did not provide the Court with the documents relating to the criminal proceedings, it is unknown whether Plaintiff was charged with more than that offense.  The possibility of additional charges, however, is immaterial to resolution of the pending motion because, as discussed below, there was probable cause to prosecute Plaintiff for all charges.  The Court will assume for the purposes of this Opinion that Plaintiff was charged with each crime alleged.

connected Plaintiff to the offenses.  (*Id.* at ¶ 110).  On that same day, another groping victim contacted law enforcement to report that Plaintiff was not the alleged perpetrator.  (*Id.* at ¶ 109).  This victim had seen Plaintiff on television in the media reports.  (*See* Tumelty Decl., Ex. B at 79).  However, after Plaintiff was arrested, another victim was shown a photo array by the NYPD Transit Bureau; the victim identified Plaintiff as the perpetrator.  (*See id.* at 63-64).

## C.  **Plaintiff's Prosecution and Attendant Media Coverage**

On April 13, 2012, Plaintiff was arraigned in Manhattan Criminal Court.  (*See* Okoh Decl., Ex. B at 42-44, 51).  Plaintiff was thereafter released on his own recognizance.  (Def. 56.1 ¶ 73).

Weeks later, on May 7, 2012, Plaintiff appeared in court, at which time all charges against him were dismissed.  The dismissal came about after Plaintiff's attorney submitted evidence, including credit card statements, sworn witness statements, computer records, and video surveillance from Plaintiff's employer, all of which demonstrated that Plaintiff did not commit the crimes charged.  (Def. 56.1 ¶ 75; *see* Okoh Decl., Ex. B at 48).

The media was outside the courthouse when Plaintiff entered for his arraignment on April 13, and present in the courtroom during the conference.  (*See* Okoh Decl., Ex. B at 38, 42).  On May 11, 2012, the *New York Daily News* published the photograph of the perpetrator from the March 30, 2012 surveillance video.  (Pl. 56.1 ¶ 106).  Other news articles of the events contained photographs of and references to the name of Plaintiff.  (*Id.* at ¶ 112).

**D.      The Instant Litigation**

Plaintiff commenced this action on December 12, 2012, against the City of New York, Det. Rama, and Police Officer Jane Doe #1. (Dkt. #1). Plaintiff brought claims pursuant to 42 U.S.C. § 1983 and the New York State Constitution, claiming that his civil rights had been violated by the Defendants' conduct during their detention, arrest, and prosecution of Plaintiff for offenses that he did not commit. (*Id.*).

After engaging in discovery, the parties proceeded to dispositive motion practice, with Defendants filing a motion for summary judgment on January 22, 2014. (Dkt. #26). Plaintiff filed his opposition on March 3, 2014 (Dkt. #32), and the motion was fully submitted on March 20, 2014, when Defendants submitted their reply (Dkt. #35).

**ANALYSIS**

**A.      Applicable Law**

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could

15

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

   If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

**B.     Discussion**

    **1.     The Court Dismisses Plaintiff's Claims Against**
           **Police Officer Jane Doe Number 1**

As a preliminary matter, Plaintiff's claims against Defendant Police Officer Jane Doe Number 1 must be dismissed for failure to prosecute.  Discovery in this case has now closed, and the record does not reflect any attempts by Plaintiff to identify and/or serve this defendant.  Indeed, neither party has mentioned this defendant in the summary judgment briefing.  Based on this record, the Court *sua sponte* dismisses Plaintiff's claims against Defendant Police Officer Jane Doe Number 1 without prejudice for failure to prosecute. *See, e.g.*, *Delrosario* v. *City of N.Y.*, No. 07 Civ. 2027 (RJS), 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe defendants for failure to prosecute "[w]here discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward* v. *Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) ("Where a plaintiff 'has had ample time to identify' a John Doe defendant but gives 'no indication that he has made any effort to discover the [defendant's] name,' ... the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant." (quoting *Kearse* v. *Lincoln Hosp.*, No. 07 Civ. 4730 (PAC), 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009))); *Keesh* v. *Artuz*, No. 97 Civ. 8417 (AKH), 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants.  Accordingly, the complaint against them must be dismissed.").

### 2. The Court Denies Summary Judgment as to Plaintiff's False Arrest Claims

#### a. False Arrest Claims Under Section 1983

Section 1983 establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  Plaintiff alleges violations of rights guaranteed to him under the Fourth and Fourteenth Amendments to the United States Constitution, and brings claims for false arrest and malicious prosecution in connection with his April 12, 2012 arrest and subsequent prosecution.

##### i. False Arrest and Probable Cause

The elements necessary to prove false arrest under Section 1983 are "substantially the same" as the elements for false arrest under New York law, save for the requirement that the constitutional tort be under color of state law. *Posr* v. *Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (quoting *Raysor* v. *Port Auth. of New York and New Jersey*, 768 F.2d 34, 39-40 (2d Cir. 1985)).  To establish a claim for false arrest, the plaintiff must show that: (i) he was intentionally confined; (ii) he was conscious of the confinement; (iii) he did not consent to the confinement; and (iv) the confinement was not privileged.  *Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012); *accord Shain* v. *Ellison*, 273 F.3d 56, 67 (2d Cir. 2001).

By way of background, a claim of false arrest under Section 1983 is rooted in the Fourth Amendment, which provides an individual with the right to not be arrested without probable cause.  *Weyent* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest, rest[s] on the Fourth

18

Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause."). At the same time, a claim for false arrest cannot be established when the arresting officer had probable cause to make the arrest. *Singer* v. *Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

More to the point, "the existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether the action is brought under state law or under § 1983." *Weyant*, 101 F.3d at 852; *see also Fulton* v. *Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest."). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. *Gonzales* v. *City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852).

"The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyent*, 101 F.3d at 852; *Douglas* v. *City of New York*, 595 F. Supp. 2d 333, 340 (S.D.N.Y. 2009) ("The Second Circuit has held that a determination of whether probable cause to arrest existed may be

made as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." (internal quotation marks omitted)).  When determining whether probable cause exists to arrest, a court "must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).  "A court examines each piece of evidence and considers its probative value, and then 'look[s] to the totality of the circumstances' to evaluate whether there was probable cause to arrest and prosecute." *Stansbury* v. *Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).

### ii.    What Constitutes an "Arrest"

The Fourth Amendment protects against unreasonable searches and seizures by the Government, including "brief investigatory stops of persons … that fall short of traditional arrest." *United States* v. *Arvizu*, 534 U.S. 266, 273 (2002).  The Supreme Court has held, however, that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry* v. *Ohio*, 392 U.S. 1, 22 (1968).  A police officer may permissibly make an investigatory stop where the officer "has reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States* v. *Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 393 U.S. at 30); *United States* v. *Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some

objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.").

On the other hand, "[i]f the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause." *Posr*, 944 F.2d at 98 (internal quotation marks omitted). An investigative detention amounts to an arrest under the Fourth Amendment if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 96 (quoting *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980)); *see also Brewton* v. *City of New York*, 550 F. Supp. 2d 355, 365 (E.D.N.Y. 2008) ("If a reasonable person would not feel free to leave police custody, an arrest has likely occurred.").

"There is no bright line rule differentiating an arrest from a detention supportable by less than probable cause." *Posr*, 944 F.2d at 98. "Whether a seizure is an arrest or merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Id.* The "pertinent considerations" to consider when assessing whether an encounter between law enforcement and an individual is an arrest or an investigatory detention include:

> [T]he amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, ... and in particular such factors as the number of agents involved ...; whether the target of the stop was suspected of being armed ...; the duration of the stop ...; and the physical

treatment of the suspect …, including whether or not handcuffs were used.

*Oliveira* v. *Mayer*, 23 F.3d 642, 645 (2d Cir. 1994) (alternations in original).

### b. Plaintiff Has Identified a Genuine Issue of Material Fact Concerning the Timing of His Arrest

Plaintiff argues — and the Court agrees — that in order to determine whether he can proceed to trial with his claims for false arrest, it must first be determined at what point Plaintiff was arrested, and whether at that time there existed probable cause for his arrest.  (Pl. Opp. 5).[6]  In that regard, Plaintiff contends that he was "arrested when placed in a secure interview room [at the police station], his property was removed from him, and he was not free to leave," and further contends that at that time, there was not probable cause to arrest him.  (*Id.* at 6).[7]  Defendants, by contrast, maintain that Plaintiff was

---

[6]    Plaintiff also argues that Defendants failed to conduct the proper investigation, and that had they done so, they would have promptly realized that Plaintiff was not the alleged perpetrator.  (*See, e.g.,* Pl. Opp. 6).  In so doing, Plaintiff seeks to impose a burden on Defendants that does not exist under the law.  Law enforcement is under no duty to "investigate independently every claim of innocence," nor is it required to "perform an error-free investigation."  *Baker* v. *McCollan*, 443 U.S. 137, 146 (1979); *see also Crawford* v. *City of New York*, 477 F. App'x 777, 778-79 (2d Cir. 2012) (summary order) ("An officer need not be certain that a subsequent prosecution will succeed, and is it 'of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation.'" (quoting *Krause* v. *Bennett*, 887 F.2d 362, 371 (2d Cir. 1989)); *Panetta*, 460 F.3d at 395-95 ("[T]he fact that an innocent explanation may be consistent with the facts alleged … does not negate probable cause, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." (internal citation and quotation marks omitted)).

[7]    Plaintiff relies on an expert report provided by Edward Mamet, titled "Analysis and Preliminary Report of the Arrest and Prosecution of Karl Vanderwoude" (Tumelty Decl., Ex. C), to support his argument that he was arrested at the time claimed, and that law enforcement lacked probable cause to effectuate this arrest.  (Pl. Opp. 7-11).  While an expert is "qualified by experience to assist the trier of fact," *Hygh* v. *Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992), an expert's opinion does not replace the function of the jury.  It is for the jury to assess the weight, if any, it will give to an expert opinion.  *See Raskin* v. *Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[D]isputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve.").  In that regard, this Court will not rely on the expert report to decide the question of

arrested at the time the formal arrest was effectuated and, perhaps more importantly, after the victim at the first lineup positively identified Plaintiff as the perpetrator.  (Def. Br. 5).  Indeed, Defendants rely on the positive lineup identifications as the basis for probable cause to arrest, and concede that "an anonymous informant" alone cannot establish the probable cause necessary for arrest.  (*See id.* at 6).

As particularly pertinent here, "[t]he issue of precisely when an arrest takes place is a question of fact."  *Posr*, 944 F.2d at 99; *accord United States* v. *Tehrani*, 49 F.3d 54, 58 (2d Cir. 2005) ("At what point a permissible investigative detention ripens into an arrest is a question of fact.").  To that end, "[i]n a section 1983 action, it would usually be a jury's task to decide whether a detention amounted to a *de facto* arrest, since [t]he issue of precisely when an arrest takes place is a question of fact."  *Oliveira*, 23 F.3d at 645 (internal quotation marks omitted)); *see also Sibron* v. *New York*, 392 U.S. 40, 67 (1968) ("It is a question of fact precisely when, in each case, the arrest took place."); *Brown* v. *City of Oneonta, New York*, 235 F.3d 769, 776 n.2 (2d Cir.

---

when Plaintiff was arrested; that is a fact question reserved for the jury.  *Id.* ("[A]n expert's report is not a talisman against summary judgment."); *see also Brink* v. *Muscente*, No. 11 Civ. 4306 (ER), 2013 WL 5366371, at *13 (S.D.N.Y. Sept. 25, 2013) ("[T]he Court cannot grant summary judgment on the say so of expert testimony because juries are entitled to discredit or reject expert testimony.").

As to Mr. Mamet's opinion that probable cause was lacking to arrest Plaintiff at the time Plaintiff claims he was *de facto* arrested, because Plaintiff has raised an issue of fact as to when he was arrested, the Court need not assess that issue.  In any event, "the issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of expert opinion testimony."  *Rizzo* v. *Edison, Inc.*, 419 F. Supp. 2d 338, 348 (W.D.N.Y. 2005), *aff'd*, 172 F. App'x 391, 394 (2d Cir. 2006) (summary order) ("[T]he existence of probable cause is a question of law that is not properly the subject of expert testimony."); *cf. Hygh*, 961 F.2d at 363 ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

23

2000) ("[T]he question of when an investigative stop ripens into an arrest is for the finder of fact."); *Zirlin* v. *Vill. of Scarsdale*, 365 F. Supp. 2d 477, 484 (S.D.N.Y. 2005) ("The circumstances surrounding an arrest, which is an extreme form of seizure, present questions of fact for the jury."); *People* v. *Butterfly*, 25 N.Y.2d 159, 162 (1969) ("The question of precisely when an arrest occurs is one of fact."); *but cf. Gilles* v. *Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) ("Whether [the plaintiff] reasonably believed that she was not free to leave the scene once her handcuffs were removed, or to refuse [the officer's] request that she accompany the officers to police headquarters, is normally a question of law, to be determined from the circumstances as they developed.").

Plaintiff voluntarily accompanied the detectives to the police station, during which time he was never placed in handcuffs. While at the police station, law enforcement attempted to determine whether Plaintiff was the person depicted in the surveillance footage of the reported incidents. Plaintiff's personal items were taken from him, and Det. Rama testified that Plaintiff was not allowed to leave.[8] The record before the Court, taken in the light most favorable to Plaintiff, indicates that Plaintiff may have been held at the police station for approximately four to five hours.[9] On this basis, a factfinder could reasonably conclude that Plaintiff was *de facto* arrested at some point prior to

---

[8]     Det. Rama did not testify as to whether he told Plaintiff that he was not free to leave. Prior to participating in the first lineup, however, Plaintiff was informed that if he was not identified in the lineup, he would then be free to leave. (Def. 56.1 ¶ 64).

[9]     The police reports indicate that Det. Rama began his interview with Plaintiff at 6:15 p.m. (Okoh Decl., Ex. H), and that Plaintiff was formally arrested at 10:25 p.m. (*id.*, Ex. J). In addition, Plaintiff recalled remaining in the interview room for approximately 30 to 45 minutes before Det. Rama spoke with him. (*Id.*, Ex. B at 19).

the first lineup, and prior to being formally arrested.  *See Rarick* v.

*DeFrancesco*, 94 F. Supp. 2d 279, 288 (N.D.N.Y. 2000) ("[A]lthough the

Supreme Court has declined to set an outside time-limit for a reasonable

detention, it has held that a 90-minute detention was unreasonable on the

basis of its duration alone." (citing *United States* v. *Place*, 462 U.S. 696, 709

(1983))).  Put simply, the record is unclear as to (i) the amount of time that

Plaintiff was held at the police station prior to being formally arrested and

(ii) the conditions of Plaintiff's holding during that time.

What is more, assuming the jury finds that a *de facto* arrest occurred, it

is for the jury to decide when precisely this took place — be it the moment

Plaintiff was placed in the interview room and had his personal items taken

from him, at some point thereafter when the conditions and length of time

during which Plaintiff was detained triggered a *de facto* arrest, or at the

moment Plaintiff was formally arrested.  These are factual questions ill-suited

for summary judgment, particularly because of the damage assessments that

may flow from these factual determinations.  *See Posr*, 944 F.2d at 99-100

(remanding for the jury to determine when an arrest took place); *see also*

*Oliveira*, 23 F.3d at 645 (recognizing that a district court may decide on

summary judgment the issue of whether an arrest has been made where "there

can be but one conclusion as to the verdict that reasonable [jurors] could have

reached" (internal quotation marks omitted)); *Gill* v. *City of New York*, No. 02

Civ. 10201 (RWS), 2004 WL 816449, at *7 (S.D.N.Y. Apr. 16, 2004) ("[B]ecause

[t]he issue of precisely when an arrest takes place is a question of fact, and

because there is a factual issue as to the timing of his detention and the facts available to [the detective defendant], [the plaintiff's] false arrest claim survives the Defendants' motion for summary judgment." (internal quotation marks and citation omitted)); *D'Addio* v. *Maldonado*, No. 3:03 Civ. 1460 (CFD), 2006 WL 533790, at \*4 (D. Conn. Mar. 3, 2006) ("Because disputed issues of fact exist as to the cause, duration, and condition of [the plaintiff's] detention, summary judgment as to whether the detention violated [the plaintiff's] rights under the Fourth Amendment is inappropriate."); *cf. Fredericks* v. *City of New York*, No. 07 Civ. 3659 (LAK) (JCF), 2008 WL 506326, at \*5 (S.D.N.Y. Feb. 25, 2008) (recommending denial of motion to dismiss a false arrest claim, because the issue of whether the plaintiff's detention "was merely a *Terry* stop or a full-blown arrest depend[ed] on factual considerations[,] and as such "dismissal at [that] stage would be inappropriate" (report and recommendation)).

Also of note is the fact that the record does not clearly support a finding of probable cause prior to the time when Plaintiff contends he was arrested, and thus the issue of when the arrest occurred does matter in determining whether Plaintiff states a claim for false arrest.  For example, at the time Plaintiff contends he was arrested, the only information available to law enforcement was the anonymous tip identifying Plaintiff as the suspect and Plaintiff's admissions that he looked like (but was not) the individual in the photographs shown to him by Det. Rama.[10]  Although Det. Rama and another

---

[10]    Plaintiff argues that because the tip received by Defendants was "uncorroborated by an unknown person," the information is subject to a review under *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969), two Supreme Court decisions assessing the sufficiency of probable cause to support a search warrant based

detective thought that Plaintiff looked like the person in the surveillance evidence, they too were uncertain whether the person was in fact Plaintiff. (Tumelty Decl., Ex. B at 68 ("[W]e were looking at the photographs.  You were looking at the photographs and you could not be 100 percent sure.  That's why we decided to do the line-up.")).

In contrast, at the time Defendants maintain Plaintiff was arrested, law enforcement had, in addition to the aforementioned evidence, a positive identification of Plaintiff in a lineup.  Of course, this positive identification cannot be used to support a finding of probable cause for an arrest prior to the lineup, i.e., when Plaintiff claims he was arrested.  *O'Brien* v. *City of Yonkers*, No. 07 Civ. 3974 (KMK) (LMS), 2013 WL 1234966, at *5 (S.D.N.Y. Mar. 22, 2013) (recognizing that only those facts known to law enforcement at the time the plaintiff alleged he was arrested may be considered for determining

---

on an undisclosed informant's information.  (Pl. Opp. 6).  *Aguilar* and *Spinelli*, however, no longer govern Plaintiff's federal false arrest claim because those cases were overruled by *Illinois* v. *Gates*, 462 U.S. 213 (1983).  In *Gates*, the Court "conclude[d] that it is wiser to abandon the 'two-pronged test' established by our decisions in *Aguilar* and *Spinelli*.  In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations."  *Id.* at 238.

The *Aguilar-Spinelli* test, as it is known, still "remains the law of New York."  *People* v. *Chisholm*, 21 N.Y.3d 990, 994 (2013) ("Under the so-called *Aguilar-Spinelli* test, an application for a warrant based on information from an undisclosed informant must show both the informant's veracity or reliability and the basis of his or her knowledge.").  Defendants contend that the *Aguilar-Spinelli* test applies only to the issuance of a search warrant based on an affidavit.  (Def. Reply 3).  New York law holds otherwise. *See People* v. *Porter*, 101 A.D.3d 44, 46 (3d Dep't 2012) ("Generally, the *Aguilar-Spinelli* test is used in evaluating whether an informant's tip was sufficient to provide the police with *probable cause* either for the issuance of a search warrant or a warrantless arrest." (emphasis in original)); *McClary* v. *Conway*, No. 06 Civ. 2064 (ENV), 2010 WL 3928563, at *6 (E.D.N.Y. Oct. 4, 2010) ("Under New York law, an informant's tip must satisfy the two-pronged *Aguilar-Spinelli* test to constitute probable cause for a warrantless arrest."). The Court need not here determine the applicability of the *Aguilar-Spinelli* test; its finding that an issue of material fact exists as to when Plaintiff was arrested obviates the need to determine the credibility of the anonymous tip for probable cause purposes.

probable cause on a motion for summary judgment); *see also Brewton*, 550 F.
Supp. 2d at 365-66 (noting that "the facts relevant on [a motion for summary
judgment] to the probable cause inquiry [were] those facts known to [the
detective] prior to th[e] earliest alleged confinement" of the plaintiff); *Pace* v.
*Town of Southampton*, No. 08 Civ. 3719 (ADS) (ARL), 2010 WL 104244, at *3
(E.D.N.Y. Jan. 13, 2010) ("[F]acts learned subsequent to the arrest, whether
they buttress or belie the existence of probable cause, are irrelevant to the false
arrest claim." (internal quotation marks omitted)).

Construing the facts in the non-movant's favor, as the Court must on a
summary judgment motion, Plaintiff has raised an issue of fact as to when he
was arrested.  Because it is for the jury to decide when the arrest took place,
the Court cannot resolve Plaintiff's false arrest claims under federal and state
law on the instant motion.  Accordingly, Defendants' motion for summary
judgment on Plaintiff's false arrest claims is denied.

### c.    Issues of Fact Foreclose a Finding of Qualified Immunity for Detective Rama on Plaintiff's False Arrest Claims

Having determined that Plaintiff's false arrest claims survives
Defendants' motion for summary judgment, the Court must now consider the
related issue of whether Det. Rama is entitled to qualified immunity.  The law
is clear that "[e]ven if probable cause to arrest is ultimately found not to have
existed, an arresting officer will still be entitled to qualified immunity from a
suit for damages if he can establish that there was arguable probable cause to
arrest." *Escalera* v. *Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation
marks omitted).  "Arguable probable cause exists 'if either (a) it was objectively

reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino* v. *City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).  "Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest." *Id.* (internal quotation marks omitted).

Qualified immunity should not be granted where, as here, there are factual disputes as to the underlying events, namely when Plaintiff was arrested.  *See, e.g.*, *Oliveira*, 23 F.3d at 649 ("Though immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (internal quotation marks and citations omitted)); *Mickle* v. *Morin*, 297 F.3d 114, 122 (2d Cir. 2002) (a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity where the circumstances are in dispute).  Defendants' request for qualified immunity as to Plaintiff's claim for false arrest must therefore be denied at this time. [11]  *Gill*, 2004 WL 816449, at *8 (denying the defendants' request for

---

[11]    Defendants' argument that Det. Rama is entitled to qualified immunity is rooted in federal law.  (Det. Br. 10-11).  Out of an abundance of caution, however, the Court holds that its conclusion that Det. Rama is not entitled to qualified immunity at this juncture is equally applicable to Plaintiff's false arrest claim under New York State law. *Jones* v. *Parmley*, 465 F.3d 46, 63-64 (2d Cir. 2006) (identifying that "New York law … does grant government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without reasonable basis," and recognizing that "New York courts are no different" from federal courts in denying a request for qualified immunity for a false arrest claim where the parties dispute material facts); *Simpkin* v. *City of Troy*, 638 N.Y .S.2d 231, 232 (3d Dep't 1996) ("Clearly,

qualified immunity as to the plaintiff's claims for false arrest, where there were factual disputes as to the underlying events).

### 3. The Court Grants Summary Judgment as to Plaintiff's Malicious Prosecution Claims

Plaintiff's malicious prosecution claims under federal and state law fare less well.  A claim for malicious prosecution under New York law requires a showing that: (i) the defendant initiated a criminal proceeding; (ii) that was terminated favorably to the plaintiff; (iii) there was no probable cause for the criminal charge; and (iv) the defendant acted maliciously.  *See Rothstein* v. *Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (citing *Savino* v. *City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)); *accord Bernard* v. *United States*, 25 F.3d 98, 104 (2d Cir. 1994).  To allege a cause of action for malicious prosecution under § 1983, a plaintiff must allege, "in addition to the elements of malicious prosecution under state law, that there was a [] sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  *Rohman* v. *New York City Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

As with a claim for false arrest, probable cause is a complete defense to a claim for malicious prosecution.  *Manganiello* v. *City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) ("[T]he existence of probable cause is a complete defense to a claim for malicious prosecution in New York.").  "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases."  *Stansbury*, 721 F.3d at 95.  "Probable cause

---

without a factual resolution of the sharply conflicting versions of these events, it is not possible to determine whether defendants are qualifiedly immune.").

consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." *Colon* v. *City of New York*, 60 N.Y.2d 78, 82 (1983); *see also Rounseville* v. *Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994) ("In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" (quoting *Pandolfo* v. *U.A. Cable Sys. of Watertown*, 171 A.D.2d 1013, 1013 (4th Dep't 1991))). The determination of probable cause in a malicious prosecution claim is "assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Drummond* v. *Castro*, 522 F. Supp. 2d 667, 677-78 (S.D.N.Y. 2007).

In malicious prosecution cases brought against police officers, a plaintiff can "demonstrate[] that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints." *Mitchel* v. *Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006); *Llerando-Phipps* v. *City of New York,* 390 F. Supp. 2d 375, 382-83 (S.D.N.Y. 2005) ("In malicious prosecution cases against police officers, plaintiffs have met this first element by showing that officers brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint." (internal citations omitted)).

In this setting, "identification of an individual as a perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth." *Rodriguez* v. *State of New York*, No. 95 Civ. 3639 (SHS), 1996 WL 197749, at *2 (S.D.N.Y. Apr. 23, 1996) (collecting cases); *see also Stansbury*, 721 F.3d at 90 ("[A]bsent circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause." (internal quotation marks omitted)); *Oliveira*, 23 F.3d at 647 ("[W]hen information furnished by a single complainant suffices to establish probable cause, such information often comes from the victim, who has provided specific details of the crime."); *Rizzo*, 172 F. App'x at 393 ("Both New York State and federal courts have held that a purported crime victim's identification of the alleged culprit will generally suffice to create probable cause to arrest." (internal quotation marks omitted)); *Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity.").

After Plaintiff was arrested, and at the time he was presented for arraignment on May 13, 2014, he had been identified in two separate lineups by two separate victims. Plaintiff was also subsequently identified by still another victim in a photo array prepared by the NYPD Transit Bureau. Plaintiff has suggested no reason to doubt the veracity of the victims who identified

32

Plaintiff, and the record indicates none.[12]  Although "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause," *Colon*, 60 N.Y.2d at 82, the record does not suggest that this case presents such a circumstance.  Law enforcement had two positive lineup identifications of Plaintiff, coupled with an anonymous tip and the striking similarity between Plaintiff and the perpetrator, as acknowledged by Plaintiff himself.

With the clarity of hindsight, one can always point to facts, such as the victim who did not identify Plaintiff in the third lineup, as indicators that further inquiry should have been undertaken.  But Defendants were not required to "investigate independently every claim of innocence," or "perform an error-free investigation."  *Baker*, 443 U.S. at 146.  The evidence that was known to Defendants at the time Plaintiff was arrested would, as a matter of law, have led a reasonably prudent person in like circumstances to believe that Plaintiff was guilty of the crimes charged.  The Court also notes that promptly after the District Attorney's Office received evidence exculpating Plaintiff of the crimes, the charges were expeditiously dismissed.

Plaintiff's malicious prosecution claim also fails for lack of malice.  "Under New York law, malice does not have to be actual spite or hatred, but only a showing 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the

---

[12]    As the Second Circuit has stated, "[u]nder New York law an identified citizen informant is presumed to be reliable.  We have endorsed a similar proposition.  The same rule applies to identifications of the perpetrator from photographic arrays."  *Stansbury*, 721 F.3d at 91 n.5.

ends of justice served.'" *Lowth*, 82 F.3d at 573 (quoting *Nardelli* v. *Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978)).  Plaintiff does not point to — and, indeed, the record is devoid of — any facts indicating that Det. Rama acted with the requisite malice to support a malicious prosecution claim.  *Rizzo*, 172 F. App'x at 394 n.1 (holding that the plaintiff's malicious prosecution claim also failed for a lack of malice, and explaining that the plaintiff's arguments as to what steps the officer could have taken to improve the investigation at issue "did not constitute evidence of malice").

Because there was probable cause to prosecute Plaintiff and because Plaintiff has failed to establish that Det. Rama acted with malice, Plaintiff's malicious prosecution claim must be dismissed.[13]

### 4.    The Court Grants Summary Judgment as to Plaintiff's *Monell* Claim

Municipalities may be sued directly for constitutional violations pursuant to 42 U.S.C. § 1983, *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658 (1978), but cannot be held liable for the acts of their employees under the doctrine of *respondeat superior.  Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 478 (1986). To state a claim for municipal liability, a plaintiff must show that a violation of his constitutional rights resulted from a municipal policy or custom.  *Monell*,

---

[13]    Because the Court grants summary judgment as to Plaintiff's malicious prosecution claim, it need not decide whether Det. Rama is entitled to relief under the doctrine of qualified immunity.  *See Adrakor* v. *City of New York*, No. 03 Civ. 9423 (TPG), 2008 WL 818560, at *3 (S.D.N.Y. Mar. 26, 2008) (holding that "the court need not address whether [the defendant was] entitled to qualified immunity" where it had dismissed the plaintiff's claim for malicious prosecution against the defendant); *cf. Reingold* v. *Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 393 (S.D.N.Y. 2008) ("This Court, having concluded that probable cause existed for plaintiff's arrest, need not reach the issue of qualified immunity [for the plaintiff's false arrest claim under federal and state law.]").

436 U.S. at 694.  A plaintiff may establish such a violation in a number of

ways, including by alleging "

> [i] an express policy or custom, [ii] an authorization of a policymaker
> of the unconstitutional practice, [iii] failure of the municipality to
> train its employees, which exhibits a 'deliberate indifference' to the
> rights of its citizens, or [iv] a practice of the municipal employees
> that is "so permanent and well settled as to imply the constructive
> acquiescence of senior policymaking officials."

*Biswas* v. *City of New York*, No. 12 Civ. 3607 (JGK), 2013 WL 5421678, at

\*24 (S.D.N.Y. Sept. 30, 2013) (quoting *Pangburn* v. *Culbertson*, 200 F.3d

65, 71-72 (2d Cir. 1999)).

Plaintiff proceeds on a failure-to-train theory, arguing that Det. Rama's

conduct in handling the investigation establishes that the City of New York

failed to train its employees to handle criminal investigations and failed to

supervise their employees adequately.  (Pl. Opp. 12-13).  Because the Court

has already dismissed Plaintiff's malicious prosecution claim, only his false

arrest claim could potentially suffice to create *Monell* liability against the City.

*Cf. Bobolakis* v. *DiPietrantonio*, 523 F. App'x 85, 87 (2d Cir. 2013) (summary

order) (affirming dismissal of *Monell* claims where plaintiff "suffered no violation

of his constitutional rights [and as such] there is no basis for imposition of

liability on the Town" (citing *Segal* v. *City of New York*, 459 F.3d 207, 219 (2d

Cir. 2006))).

"A municipality's culpability for a deprivation of rights is at its most

tenuous where a claim turns on a failure to train."  *Connick* v. *Thomson*, 131 S.

Ct. 1350, 1359 (2011).  A plaintiff must meet the "stringent" deliberate

indifference standard, which requires "proof that a municipal actor disregarded

a known or obvious consequence of his action." *Id.* at 1360.  In other words, "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.*; *see also Castilla* v. *City of New York*, No. 09 Civ. 5446 (SHS), 2012 WL 5510910, at *5 (S.D.N.Y. Nov. 14, 2012) ("[A] plaintiff must prove that municipal policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, but nevertheless the city officials choose to retain that program." (internal quotation marks and citations omitted)).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360.  Plaintiff fails to meet the deliberate indifference standard.

The Supreme Court has identified that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S. Ct. at 1360 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.* v. *Brown*, 520 U.S. 397, 409 (1997)).  To create failure-to-train liability, the Second Circuit requires a plaintiff to establish three requirements:

> First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. ... Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. ... Finally, the plaintiff must

> show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Walker* v. *City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).  A plaintiff must also demonstrate "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation."  *Amnesty Am.* v. *Town of West Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton, Ohio* v. *Harris*, 489 U.S. 378, 391 (1989)).  Stated differently, "plaintiffs must establish that the officer's shortcomings … resulted from … a faulty training program rather than from the negligent administration of a sound program or other unrelated circumstances."  *Id.* (internal quotation marks omitted)).

Plaintiff's claim that these requirements are met (Pl. Opp. 13), does not hold water for the fundamental reason that Plaintiff has set forth no facts to indicate that the City failed to train Det. Rama or that the training provided to him was inadequate.  Indeed, Plaintiff points to no training program that caused the violation of his rights, and the Court has identified none.  Similarly, the record presents no pattern of similar constitutional violations to even raise an issue that there may be a failure-to-train claim.

Even assuming Det. Rama was not adequately trained — an assumption not supported by the record — that alone would not result in *Monell* liability against the City.  *Canton*, 489 U.S. at 391 ("[T]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.").  Plaintiff's failure to identify facts demonstrating a pattern

of similar conduct that could establish the existence of a policy of failing to train police officers, leaves Plaintiff struggling to fall within the "'single-incident liability that [the United States Supreme] Court hypothesized in *Canton*.'" *Connick*, 131 S. Ct. at 1361.

Under the single-incident theory, *Monell* liability may lie against a city for a single instance of misconduct by an employee if, under the circumstances, the unconstitutional consequence of the failure to train was "plainly obvious." *Canton*, 489 U.S. at 390 n.10.  Again, Plaintiff's claim fails because there is nothing from which the Court can discern any failure to train on the part of Defendant City of New York.  *Amnesty Am.*, 361 F.3d at 130-31 ("Because plaintiffs have failed to raise an inference that the police were improperly trained and that this training caused them to use excessive force, we affirm the district court's grant of summary judgment as to this theory of municipal liability.").

Allowing Plaintiff's *Monell* claim to proceed on this record "would result in *de facto respondeat superior* liability for municipalities."  *Connick*, 131 S. Ct. at 1360 (quoting *Canton*, 489 U.S. at 392).  The Court cannot countenance such a result.

### 5.    The Court Dismisses Plaintiff's State Law Claims

Defendants have also moved for summary judgment as to Plaintiff's claims under New York State law for negligence and gross negligence, assault, battery, and defamation.  Plaintiff fails to respond to these claims in his opposition to Defendants' summary judgment motion.  For that reason, the

Court could dismiss these claims as abandoned. *See, e.g.*, *Gatson* v. *City of New York*, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012) (dismissing the plaintiff's claims for negligent hiring, training, and supervision where the defendants moved for summary judgment on those claims, and the plaintiff failed to respond to or even mention those claims in his opposition); *see also Anti-Monopoly, Inc.* v. *Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) (stating that "[t]he Court also notes that, under New York state law, the failure to provide argument on a point at issue constitutes abandonment of the issue," and holding that the plaintiff's failure to provide any argument opposing the defendant's motion relating to certain state law claims, was "an independent basis for dismissal"). Yet, because these claims have not been formally dismissed, the Court will consider these portions of Defendants' summary judgment motion as unopposed, and assess the merits of Plaintiff's claims.

"[I]n considering a motion for summary judgment, [the court] must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Vermont Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (quoting *Custer* v. *Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993)). Assessing Plaintiff's claims under this rubric, the Court holds that each of Plaintiff's remaining state law claims fail as a matter of law.

### a.    Plaintiff's Negligence and Gross Negligence Claims

Plaintiff's negligence and gross negligence claims are predicated on the theory that Defendants failed to investigate properly the evidence against

Plaintiff — in other words, that Defendants were negligent in the preparation of the case against Plaintiff.  (*See* Compl. ¶¶ 103-05).  Plaintiff has not asserted a cognizable claim.[14]

"It is well settled that New York courts do not recognize claims for negligent or malicious investigation.  *Johnson* v. *Kings Cnty. Dist. Attorney's Office*, 308 A.D.2d 278, 284 (2d Dep't 2003).  Where a plaintiff seeks relief for injuries occasioned by allegations of inadequate investigation and a resulting erroneous arrest and prosecution, as Plaintiff does here, the plaintiff "may not recover under broad general principles of negligence, [] but must proceed by way of the traditional remedies of false arrest and imprisonment and malicious prosecution."  *Boose* v. *City of Rochester*, 71 A.D.2d 59, 62 (4th Dep't 1979); *see also Johnson*, 308 A.D.2d at 284-85 ("A plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad principles of negligence … but must proceed by way of the traditional remedies of false arrest and imprisonment."); *Media* v. *City of New York*, 102 A.D.3d 101, 108 (1st Dep't 2012) ("[N]o cause of action for negligent investigation lies in New York." (collecting cases)).

---

[14]   Even assuming that Plaintiff had attempted to bring negligence and gross negligence claims under federal law — which he did not do — those claims too would fail. "[A]llegations of a failure to investigate do not create an independent due process claim." *Blake* v. *Race*, 487 F. Supp. 2d 187, 212 n.18 (E.D.N.Y. 2007); *McCaffrey* v. *City of New York*, No. 11 Civ. 1636 (RJS), 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) (identifying that "failure to investigate is not independently cognizable as a stand-alone claim" (internal quotation marks omitted)).  Instead, those claims are subsumed by a plaintiff's false arrest and malicious prosecution claims.  *Campbell* v. *Giuliani*, No. 99 Civ. 2603 (JG), 2000 WL 194815, at *3 n.6 (E.D.N.Y. Feb. 16, 2000) ("[I]n the context of §1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution." (collecting cases)).

For these reasons, Plaintiff's negligence and gross negligence claims must be dismissed.  *Simon* v. *State of New York*, 12 A.D.3d 171, 171 (1st Dep't 2004) (holding that the plaintiff could not assert negligence claims where he was "clearly seeking damages for wrongful arrest and detention," and stating that the plaintiff "must proceed by way of the traditional remedies of false arrest and imprisonment"); *Carlton* v. *Nassau Cnty. Police Dep't*, 306 A.D.2d 365, 366 (2d Dep't 2003) ("[T]he cause of action alleging negligent investigation should have been dismissed because it does not state a cause of action separate and distinct from those to recover damages for false arrest and imprisonment and for malicious prosecution.").

### b.    Plaintiff's Defamation Claim

"To state a claim for defamation under New York law, the plaintiff must allege [i] a false statement about the plaintiff; [ii] published to a third party without authorization or privilege; [iii] through fault amounting to at least negligence on [the] part of the publisher; [iv] that either constitutes defamation per se or caused 'special damages.'" *Thai* v. *Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010).  Contrary to Defendants' argument (Def. Br. 13), Plaintiff's defamation claim is not subject to the particularity requirements of New York Civil Practice Law and Rules § 3016(a), but rather is governed by Rule 8 of the Federal Rules of Procedure.  *Unique Sports Generation, Inc.* v. *LGH-III, LLC*, No. 03 Civ. 8324 (JGK) (DF), 2005 WL 2414452, at *9 (S.D.N.Y. Sept. 30, 2005) ("Plaintiff's first argument fails because a claim for defamation brought in federal court is governed by Federal Rule of Civil Procedure 8, and

not, as Plaintiff asserts, Section 3016(a) of the New York Civil Practice Law and Rules."). Under Rule 8, "[a] defamation claim 'is only sufficient if it adequately identifies 'the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated.'" *Thai*, 726 F. Supp. 2d at 329 (quoting *Scholastic, Inc.* v. *Stouffer*, 124 F. Supp. 2d 836, 849 (S.D.N.Y. 2000)); *see also Fleming* v. *Hymes-Esposito*, No. 12 Civ. 1154 (JPO), 2013 WL 1285431, at *7 (S.D.N.Y. Mar. 29, 2013) ("To survive a motion to dismiss a defamation claim, a plaintiff must, at a minimum, identif[y] the purported communication, and [indicate] who made the communication, when it was made, and to whom it was communicated." (internal quotation marks omitted)).

Plaintiff fails to identify the communication at issue, when it was made, or to whom it was communicated. Rather, Plaintiff merely alleges that "[t]he acts and omissions of the aforesaid defendants were done with malice and with knowledge of the falsity of the claims or with reckless disregard for the truth of the claims made." (Compl. ¶ 114). Plaintiff has not proffered any of these facts, nor has he raised an issue of fact as to the elements of his claim, in opposition to Defendants' motion for summary judgment. Plaintiff has failed to offer evidence of a *prima facie* case for defamation, and therefore, this claim must be dismissed. *In re Andrew Velez Const., Inc.*, 373 B.R. 262, 282 (Bankr. S.D.N.Y. 2007) (dismissing the plaintiff's claim because he failed to identify who made the statements or when they were made).

### c.    Plaintiff's Assault and Battery Claims

To state a claim for assault under New York law, the plaintiff must allege "an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden* v. *Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001). For a claim of battery, the plaintiff must establish "an intentional wrongful physical contact with another person without consent." *Id.* The record neither presents nor suggests any facts that could support claims for assault or battery against Defendants. Accordingly, Plaintiff's claims for assault and battery are dismissed. *See, e.g.*, *Charles* v. *City of New York*, No. 11 Civ. 2783 (AT), 2014 WL 1284975, at *12 (S.D.N.Y. Mar. 31, 2014) (granting the defendants' motion for summary judgment on the plaintiff's assault and battery claims where there was no evidence that the defendants at issue engaged in intentional conduct); *Anthony* v. *City of New York*, No. 00 Civ. 4688 (DLC), 2001 WL 741743, at *13 (S.D.N.Y. July 2, 2001) (granting summary judgment on the plaintiff's assault and battery claims where the plaintiff failed to provide evidence to support a *prima facie* case); *see also Graham* v. *City of New York*, 928 F. Supp. 2d 610, 625 n.7 (E.D.N.Y. 2013) (dismissing claims for assault and battery where there was no evidence to support said claims).

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically, Defendants' motion for summary judgment as to Plaintiff's false arrest claims is denied, and Defendants' motion for summary judgment as to Plaintiff's remaining claims is

granted.  All of Plaintiff's claims except his claims for false arrest are accordingly dismissed.

In addition, it is hereby ORDERED that the parties appear for a pretrial conference to discuss setting trial in this matter on July 8, 2014, at 4:00 p.m., to be held in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York.

The Clerk of Court is directed to terminate Docket Entry 26.

SO ORDERED.

Dated: June 10, 2014
    New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge